UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

DEBORAH FONTECCHIO,

                                  Plaintiff,

                                                        **OPINION AND ORDER**

          – against –

                                                        No. 12-CV-6998 (CS)

ABC CORP., s/h/a HSBC BANK USA, N.A., *et al.*,

                                  Defendants.

------------------------------------------------------------------------x

<u>Appearances:</u>

Karen L. Zdanis,
Nanuet, New York

Michael David Diederich, Jr.
Stony Point, New York
*Counsel for Plaintiff*

Vincent Avallone
C. Bryan Cantrell
K&L Gates LLP
Newark, New Jersey
*Counsel for Defendants*

<u>Seibel, J.</u>

     Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 49.)  For the

following reasons, Defendants' Motion is granted.

**I.          BACKGROUND**

     The following facts are set forth based on Defendants' Local Civil Rule 56.1 statement

and Plaintiff's response, Plaintiff's Local Civil Rule 56.1 statement and Defendants' response,

and the parties' supporting materials, and are undisputed except as noted.

Plaintiff was employed by Defendant HSBC Bank USA, N.A. ("HSBC") for twenty-nine years before her employment ended in July of 2011, when she was forty-seven years old. (P's Response to 56.1 ¶ 1.)[1]  Plaintiff worked as a branch manager for several years, but from March 2009 until June 13, 2011, she was a market manager. (*Id.* ¶ 2.)  As a market manager, Plaintiff supervised the branch managers of nine retail bank branches in Rockland County, New York. (*Id.*)  Plaintiff reported to Defendant Nina Tyzik, District Executive for the Empire District, a woman who was fifty-eight years old in July 2011. (*Id.* ¶ 3.)  Tyzik reported to Regional President Andrew Ireland. (*Id.*)

In November 2010, HSBC created two more market manager positions in the Empire District. (*Id.* ¶ 39.)  Christopher Gomez and Lulzim Hoxha, who were both branch managers reporting to Plaintiff, were selected to fill the new market manager positions. (*Id.*)  For the year 2009, Gomez had been selected by Tyzik as "Manager of the Year" and Hoxha had been selected by Tyzik as "Rookie of the Year." (*Id.* ¶ 40.)  Plaintiff wrote in an email to Tyzik that she agreed with those decisions and would have recommended them. (*Id.*)

In June 2011, HSBC reorganized its retail bank management structure nationwide. (*Id.* ¶ 50.)  After the restructure, the district executive, market manager, and premier market leader[2] positions were eliminated and two new positions – district director and retail banking sales manager ("RBSM") – absorbed the responsibilities of the old positions. (*Id.* ¶ 51.)[3]  In the

---

[1] "P's Response to 56.1" refers to Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement of Material Facts. (Doc. 82.)

[2] The parties have not provided information about the premier market leader position, but it seems to be similar to or perhaps above market manager.

[3] Plaintiff denies that the market manager position was eliminated and that the RBSM position was new, (*see* P's Response to 56.1 ¶ 51), but her contention seems to be that "market manager" and "RBSM" were simply different names for the same job, not that a class of employees called "market managers" remained after the restructure or that one called "RBSMs" existed before it, (*see* Declaration of Deborah A. Fontecchio ("P's Decl."), (Doc. 77), ¶ 199); (Response to Plaintiff's Counter-Statement of Material Facts ("Ds' Response to 56.1"), (Doc. 85), ¶ 44-45).

Upstate New York Region, four district executive, four premier market leader, and fourteen market manager positions were replaced by two district director and fifteen RBSM positions. (*Id.* ¶ 52.)

The new district directors and RBSMs were selected by a group of four regional presidents, including Ireland.  (*Id.* ¶ 53); (Ds' Response to 56.1 ¶ 47).[4]  Ireland claims that he ranked Plaintiff lower than Gomez, Hoxha, and Niall Lepper ("Lepper"), a premier market leader, for an RBSM position because he was not confident that she would be as effective a sales coach or manager.  (Ireland Decl. ¶ 11.)[5]  He felt that given the increased responsibility of district directors after the restructuring, RBSMs would need strong leadership, accountability, and coaching skills. (*Id.*)  While he was confident Plaintiff had strong skills in retail banking operations, he questioned her coaching and leadership skills.  (*Id.*)  Gomez, Hoxha, and Lepper were selected to be RBSMs and Plaintiff was not.  (*See* P's Response to 56.1 ¶ 57); (P's Decl. ¶ 171).  Neither the age nor gender of any of the candidates were discussed during the meeting. (P's Response to 56.1 ¶ 62.)

Defendants assert that Tyzik did not participate in the selection of the district directors or RBSMs and that Ireland did not speak to Tyzik before the meeting about who to select as an RBSM.  (*Id.* ¶ 59.)  Defendants also assert that the regional presidents agreed they would select the RBSMs without input from anyone who might become a district director, because the prospective district directors were being evaluated by the same group as part of the same

---

[4] Plaintiff purports to deny that the regional presidents selected the RBSMs, (P's Response to 56.1 ¶ 53), but offers no affirmative assertion or evidence to the contrary, (*see* Ds' Response to 56.1 ¶ 47-56).

[5] "Ireland Decl." refers to the Declaration of Andrew Ireland.  (Doc. 53.)

selection process.  (*Id.* ¶ 60.)  Thus, according to Defendants, Tyzik was never informed of the meeting.  (*Id.*)[6]

Ireland did not ask about or review any documents in preparation for selecting the RBSMs.  (*Id.* ¶ 61.)  Instead, he made his assessments based on his own interactions with the candidates.  (*Id.*)  Ireland observed Plaintiff at a meeting on January 12, 2011.  (*Id.*)  The meeting was attended by Plaintiff, Ireland, Tyzik, Hoxha, Gomez, and Lepper.  (*Id.* ¶ 47.)  Defendants assert, and Plaintiff denies, that at the meeting Ireland asked each manager to give a presentation about the "movable middle" – middle-of-the-road performers who would benefit from extra management.  (*Id.* ¶¶ 46-47.)  Plaintiff testified at her deposition, however, that she and the others each made a presentation at the meeting.  (Avallone Decl. Ex. A ("P's Dep.") at 198:14-18.)[7]  Ireland claims he believed Plaintiff's presentation was poor and showed a lack of knowledge of her market and that she did not have a plan to improve the "movable middle." (Ireland Decl. ¶ 6.)  He believed Gomez, Hoxha, and Lepper presented well.  (*Id.* ¶ 7.)

Ireland communicated with Plaintiff via email on two occasions.  (P's Response to 56.1 ¶¶ 29, 31.)  Plaintiff disputes whether these emails were "coaching" opportunities or constituted feedback on Plaintiff's performance.  (*Id.* ¶¶ 29-31.)  Ireland never had a one-on-one meeting with Plaintiff before the RBSM decisions were made.  (*See* Ds' Response to 56.1 ¶ 16.)  Nor did Ireland ever directly supervise Plaintiff or the other RBSM candidates.  (*Id.* ¶ 49.)  He remembered meeting with Gomez and Hoxha on one occasion each.  (*Id.* ¶ 54.)

---

[6] Plaintiff purports to dispute that Tyzik did not participate in RBSM selection, (s*ee* P's Response to 56.1 ¶¶ 59, 60 (citing Doc. 83, Plaintiff's Counter-statement of Material Facts ("P's Counter-Statement"), ¶¶ 47-56), but offers no affirmative assertion or evidence to the contrary, (P's Counter-Statement, ¶¶ 47-56).

[7] "Avallone Decl." refers to the Declaration of Vincent N. Avallone, Esq.  (Doc. 52.)

On June 13, 2011, Ireland sent Plaintiff an electronic meeting invitation with the title "Mkt ck in." (*Id.* ¶ 66.)  The invitation stated that Ireland "[w]ant[ed] to catch up for 30 mins [*sic*]." (*Id.*)  The actual purpose of the meeting was to discuss the demise of the market manager role. (*Id.* ¶ 67.)  At the meeting, Ireland told Plaintiff the market manager position was being eliminated bank-wide, effective immediately. (*Id.* ¶ 68.)  After the meeting, Plaintiff met with an employee relations consultant, who gave Plaintiff an "Employee Package" containing information on severance benefits. (*Id.* ¶ 70.)  Soon after, Tyzik called Gomez and Hoxha, who had been scheduled for similar meetings, to inform them that their meetings were cancelled and their jobs were "safe." (Ds' Response to 56.1 ¶ 40.)  On June 27, 2011, Plaintiff received a personalized severance agreement from HSBC. (P's Response to 56.1 ¶ 74.)  The agreement is dated June 14, 2011. (Avallone Decl. Ex. FF.)

Two or three days after Plaintiff's meeting with Ireland, Tyzik informed Plaintiff that there was an opening for a branch manager position at the Highland Falls branch, at the same salary Plaintiff had been receiving. (P's Response to 56.1 ¶ 72.)  Plaintiff applied for the position on June 17, 2011. (*Id.*)  On June 29, 2011, HSBC generated an offer for Plaintiff of the Highland Falls branch manager position. (*Id.* ¶ 76.)  But on the same day, before the offer was conveyed to her, Plaintiff withdrew her application, in part because she was offended that a notice she had received, pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(f), indicated that employees had been chosen for the reduction in force based on skill set and performance. (*Id.* ¶¶ 74-77.)  Plaintiff's termination took effect July 14, 2011, thirty days after she was informed that her market manager position had been eliminated. (*Id.* ¶ 78.)  Plaintiff accepted a job at Key Bank, a competitor of HSBC, on August 9, 2011. (*Id.* ¶ 73.)  She had applied for that job on June 21, 2011. (*Id.*)

5

During Plaintiff's employment with HSBC, Tyzik sometimes referred to female employees as "girls," saying, "You go girl!" (*Id.* ¶ 83.)  Plaintiff claims Tyzik referred to a male colleague as her "work husband," and told employees that she had "moles" in the human resources department.  (*Id.* ¶¶ 89-90.)  Plaintiff also alleges that Tyzik referred to her variously as "old school," "older," "too nice," and "motherly," and told her to be "more like the boys." (P's Decl. ¶¶ 12, 15, 17.)  Plaintiff also alleges that Tyzik expressed dislike toward another female employee, Denise Slettene.  (P's Response to 56.1 ¶ 94.)  Plaintiff told Tyzik she did not agree with putting Slettene on probation.  (*Id.* ¶ 95.)

After filing claims with the New York State Division of Human Rights, (Avallone Decl. Exs. KK, NN), and obtaining a right-to-sue letter from the Equal Employment Opportunity Commission, (*Id.* Ex. OO), Plaintiff filed this action on September 14, 2012, (Doc. 1).  In her Second Amended Complaint, Plaintiff alleged disparate treatment, hostile work environment, and retaliation in violation of the New York State Human Rights Law ("NYSHRL") against HSBC and Tyzik, and disparate treatment, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the ADEA, and the Employee Retirement Income Security Act ("ERISA") against HSBC.  (Doc. 10.)  I dismissed Plaintiff's ERISA and federal retaliation claims, (*see* Doc. 31), and, after discovery, this motion followed.

## II.      DISCUSSION

### A.  Legal Standards

#### 1. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if satisfied, the burden then shifts to the non-movant to present evidence sufficient to satisfy every element of the claim.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Where, as here, affidavits are used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542

F.3d 290, 310 (2d Cir. 2008). In the event a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

### 2. Discrimination under Title VII, ADEA, and NYSHRL

Title VII, ADEA, and NYSHRL discrimination claims are analyzed pursuant to the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973), and its progeny. *See*, *e.g.*, *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 109 (2d Cir. 2011) (summary order) (applying framework to Title VII, ADEA, and NYSHRL claims); *see also Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (notwithstanding Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), this Circuit has continued to apply *McDonnell Douglas* burden-shifting framework to ADEA claims); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 570-71 (S.D.N.Y. 2010) (applying *McDonnell Douglas* burden-shifting framework to ADEA claims after *Gross*). Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). At the *prima facie* stage, the burden of proof is minimal. *See id.* To make out a *prima facie* case of discrimination, a plaintiff must show that, "(1) [she] was within the protected class; (2) [she] was qualified for the position; (3) [she] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009), *superseded by regulation on other grounds as stated in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108 (2d

Cir. 2013); *see Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 571 (S.D.N.Y. 2010).

Once a *prima facie* case is established, "a rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis and alteration in original) (internal quotation marks omitted).

Once the defendant proffers a legitimate, non-discriminatory reason for the challenged employment action, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery*, 248 F.3d at 93. The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (alterations and internal quotation marks omitted). "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'" *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). "In short, the question

becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated. *See Reeves*, 530 U.S. at 143.

Under the ADEA, the final stage is different. The plaintiff must show not only that the defendant discriminated on the basis of age, but also that age discrimination was the "but-for" cause of the adverse action, and not merely one of the motivating factors. *Gross*, 557 U.S. at 180; *accord Gorzynski*, 596 F.3d at 106.

### B. Disparate Treatment Claims

Because the *McDonnell Douglas* framework governs Plaintiff's Title VII, ADEA, and NYSHRL disparate treatment claims, and because the evidence is largely the same with respect to both age and gender, I will address the claims together.

#### 1. Prima Facie Case

Defendants concede that Plaintiff satisfies elements (1) and (2) of the prima facie case: she is a member of a protected class and her job performance was satisfactory. They argue she has not shown an adverse employment action or circumstances supporting an inference of discrimination.

##### a. Adverse Employment Action

Plaintiff has created an issue of fact as to the adverse action element through evidence that her employment was terminated. *See, e.g., Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (noting "termination of employment" is an adverse action).[8]

---

[8] Plaintiff also points to Defendants' failure to promote her to RBSM and "refus[ing] to bestow financial favor (salary and bonus compensation, restrictive stock shares/stock options and 'company car')" on her as "other adverse actions." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("P's Mem."), (Doc. 78), at 13-14.) As to Defendants' failure to promote her, Plaintiff has offered no argument as to why the RBSM position would have been a promotion from the market manager position. (*See id.*) Indeed, her persistent urging that the two positions differ in name only would seriously undermine any such argument. (*See* P's

Defendants argue that Plaintiff was not, in fact, terminated, but instead was "informed that the Market Manager position was being eliminated . . . [and] encouraged to apply for open positions." (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Ds' Mem."), (Doc. 50), at 5.)  Under Defendants' version, Plaintiff chose to end her employment by withdrawing her application for the Highland Falls Branch Manager position as it was about to be offered to her.  *Id.*  But a jury would not necessarily have to accept that interpretation.  Whether Plaintiff had the opportunity to apply for a new position or not, the undisputed facts are that Plaintiff was informed by Ireland that her position was being eliminated bank-wide, effective immediately.  (P's Response to 56.1 ¶ 68.)  She was passed over for the new but comparable position her fellow market managers – whose jobs were "safe," (Ds' Response to 56.1 ¶ 40) – assumed.  After the meeting, she was given an "Employee Package" containing information on severance benefits and other information for terminated employees.  (Avallone Decl. Ex. BB.)  The next day, HSBC prepared a proposed separation agreement,

---

Response to 56.1 ¶ 51; P's Decl. ¶ 199.)  Plaintiff also testified that she was not denied a promotion.  (P's Dep. 250:4-15.)  Thus Plaintiff has not established that she suffered an adverse employment action in not being promoted.

Plaintiff has offered similarly limited argument as to how her compensation serves as an adverse employment action.  To the extent she seeks to raise a claim of disparate pay under Title VII, *see Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 367 (S.D.N.Y. 2006) (reciting elements) *aff'd*, 629 F.3d 276 (2d Cir. 2010), she has not shown that she was "paid less than similarly situated non-members of [her] protected class," *see id.*  From February 2010 until her termination, Plaintiff's salary was $116,232.  (Declaration of Peter F. Hutter ("Hutter Decl."), (Doc. 55), Ex. C.)  Plaintiff claims that Hoxha had a higher salary than she, (Ds' Response to 56.1 ¶ 29), but, even assuming that Hoxha was similarly situated to Plaintiff, the record indicates that up until Plaintiff's termination Hoxha's salary was less than hers ($112,000 from March 2011 until June 13, 2011), (Hutter Decl. Ex. H).  That Hoxha's salary was increased upon his being named an RBSM – on the day that Plaintiff was informed of her termination – cannot support a disparate pay claim.  *See Thomas*, 438 F. Supp. 2d at 368 n.7 (comparators must be "similarly situated in all material respects") (internal quotation marks omitted)).  To the extent she claims she suffered disparate treatment in the awarding of restricted shares, she has failed to identify a similarly situated comparator.  Plaintiff argues that Gomez received shares in 2010 when she did not, but Gomez was a branch manager in 2010, while Plaintiff was a market manager.  (*See* Hutter Decl. Ex. Q) (Gomez awarded shares in March 2010); (P's Response to 56.1 ¶ 39) (Gomez made a market manager in November 2010); (Hutter Decl. Ex. P at 3956) (describing discretionary share awards for "Area Branch Manager, Branch Manager, and Assistant Manager" positions, but not market managers).  Plaintiff has also not demonstrated that Tyzik giving the keys to the company car to Hoxha resulted in a "materially adverse change" in the terms of her employment.  *See Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002).  Thus Plaintiff's termination is the only adverse employment action she has established with regard to her *prima facie* case.

11

which states, "Your employment has been terminated, effective 07/13/2011," and bears an

attached notice – required under the ADEA, *see* 29 U.S.C. § 626(f) – informing Plaintiff she had

"been selected for the reduction in force due to business reorganization" and listing the ages of

the other "[e]mployees in [Plaintiff's] job classification or department who are being laid off,"

(Avallone Decl. Ex. FF).  It was not until days later that Plaintiff learned about the possibility of

applying for another position, and Defendants have made no assertion that Plaintiff was

guaranteed to be offered any position for which she applied.  Plaintiff's decision to pursue or not

pursue a different position with HSBC would obviously go to damages, but does not necessarily

mean she suffered no adverse action.  A jury could conclude that Defendants' attempt to separate

the "elimination" of Plaintiff's position from the "termination" of her employment amounts to a

distinction without a difference.  *See Leibowitz*, 584 F.3d at 501 ("[W]hether plaintiff was 'laid

off' or 'terminated,' or her employment was 'not renewed' . . . she suffered an adverse

employment action because she was denied the requested continued employment, regardless of

the label."); *Elliott v. British Tourist Auth.*, 172 F. Supp. 2d 395, 397, 400 (S.D.N.Y. 2001)

(employee laid off due to budget cuts was terminated for ADEA purposes notwithstanding that

former employer offered him ongoing consultancy contract with company), *aff'd*, 40 F. App'x

629 (2d Cir. 2002).[9]

---

[9] The outcome might be different had Plaintiff walked away from an actual offer of comparable employment.  *See Paluh v. HSBC Bank USA*, 409 F. Supp. 2d 178, 202 (W.D.N.Y. 2006) (stating "a fair reading of the record establishes," but not deciding, that a laid-off employee who declined another position within company voluntarily ended employment).  But HSBC does not dispute that Plaintiff withdrew her application before an offer was made, even if HSBC was prepared to make one.  (P's Response to 56.1 ¶ 76.)  While Defendants contend that Tyzik "offered" Plaintiff the Highland Falls position when she first called to tell Plaintiff about it, there is enough evidence to create a genuine issue of fact on the point.  Tyzik made a passing reference to "Debbie's offer for the branch manager job in Highland Falls" in her deposition testimony, (Avallone Decl. Ex. B ("Tyzik Dep.") at 207:3-5), but it is unclear whether Tyzik was there referring to an offer she made personally or the one generated but never relayed.  To be sure, Tyzik does not say she offered Plaintiff the position, at least in the deposition portions the parties have provided to the Court.  (*See id.*; Declaration of Karen L. Zdanis, Esq. ("Zdanis Decl."), (Doc. 79), Ex. 12.)  The only evidence that Tyzik offered Plaintiff the job is thus a statement in a letter sent by Plaintiff's counsel to Defendants' counsel to that effect.  (*See* Avallone Decl. Ex. PP at HSBC 545.)  But Plaintiff testified that the statement was in error, (P's Dep. at 33:8-35:6), and Defendants have adopted a contrary position in maintaining that Plaintiff's offer

b.  Inference of Discrimination

Plaintiff argues that an inference of discrimination is established by virtue of the fact that she was replaced by younger men.  (P's Mem. 12) (citing, *e.g.*, *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)).  Plaintiff was not replaced *per se,* because her position was eliminated.  But courts looking to a plaintiff's replacement as evidence of discrimination focus on the transfer of the plaintiff's job responsibilities, not assumption of his or her title.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) (finding inference of discrimination where plaintiff's "duties were transferred in part to [a co-worker 18 years younger] and his remaining duties were given to [a co-worker 25 years younger]"); *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir. 1989) (finding inference of discrimination where "the majority of [plaintiff's] responsibilities were not eliminated, but were transferred to a twenty-six year old overworked coworker").  Plaintiff has produced evidence that the majority of the responsibilities of the market manager position were transferred to the RBSM position after the restructuring, (*see* Zdanis Decl. Exs. 36 (describing market manager role), 37 (describing RBSM role)), and that the people assuming RBSM roles in Plaintiff's former geographical area were Gomez, Hoxha, and Lepper, (*see id.* Ex. 1), who are males and substantially younger than she.  This is sufficient to meet the minimal burden of supporting an inference of age and gender discrimination at the *prima facie* stage.  *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (age difference of eight years between plaintiff and favored candidate sufficient to support inference of age discrimination);

---

was generated on June 29, 2011 and not communicated to her.  (*See* P's Response to 56.1 ¶ 76).  This suffices to preclude summary judgment.  *See Anderson*, 477 U.S. at 255 (evidence of non-movant to be believed); *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (the court on summary judgment must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought").  Of course, that HSBC was prepared to re-hire Plaintiff presents a significant barrier to a finding of intent to discriminate.

*Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("mere fact that a plaintiff was replaced by someone outside the protected class" sufficient to infer gender discrimination).

### 2. Defendants' Non-discriminatory Reason

Defendants have met their burden of showing a legitimate, non-discriminatory reason for terminating Plaintiff. They assert that after the restructuring

> [t]he goal was to put greater emphasis on the investment, insurance, and mortgage business lines and consolidate those business lines with the banking and branch operations roles previously managed by the District Executive and Market Manager positions. . . . While Mr. Ireland was supportive of Fontecchio being offered an RBSM position, he did not rank her as high as others who were offered the position because even though he was confident in Fontecchio's skills in retail bank operations, he was not as confident in Fontecchio's sales coaching and leadership skills. Mr. Ireland reasoned that since Tyzik would be running a much larger geographical area as a District Director . . . she would need RBSMs with strong leadership, accountability, and coaching skills.

(D's Mem. 15-16) (citations omitted).[10]

### 3. Pretext

Plaintiff has failed to produce evidence sufficient to support a finding that Defendants' stated reasons are false or that discrimination was the true reason for her termination. As an initial matter, the allegedly discriminatory statements Plaintiff attributes to Tyzik – that Plaintiff had been "around forever;" was "older," "mothering," "motherly," "old school," and "too nice;"

---

[10] Plaintiff argues this rationale should be disregarded because Defendants have not supported it with evidence. She offers no reason, however, why the testimony of HSBC's executives and corresponding documents, (*see* P's Response to 56.1 ¶¶ 50-57), are insufficient in this regard, *see Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988) ("To dispel the inference of discrimination arising from the establishment of a prima facie case, [a defendant] is required to articulate – but not prove – a legitimate, nondiscriminatory reason for the discharge.").

had "feminine qualities;" was "not winning" in regards to "longevity", and the like – are insufficient because Plaintiff has produced no evidence that Tyzik was involved in the selection of RBSMs or that the statements were related to that process.  *See*, *e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" cannot "satisfy the plaintiff's burden" to establish inference of discrimination); *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."); *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 97 (1st Cir. 1996) (plaintiffs failed to establish discriminatory animus in part because they could not show that employees who made offensive comments "were decisionmakers who made the comments in connection with the decisional process").

While Plaintiff denies Defendants' assertions that "Tyzik did not participate in the selection" of RBSMs, that Ireland did not speak with her about recommending RBSMs, and that Tyzik was not even informed that the meetings were taking place, she offers no contrary evidence.  (*See* P's Response to 56.1 ¶¶ 59, 60 (citing only ¶¶ 47-56 of Plaintiff's counterstatement of facts); P's Counter-Statement ¶¶ 47-56 (the cited paragraphs, which do not mention any participation by Tyzik in the RBSM decisions)).  The only affirmative evidence she offers even arguably suggesting any influence on Tyzik's part is an email from Tyzik to Ireland dated February 17, 2011 – four months before the decision meeting – saying that Plaintiff was Tyzik's "weakest link" in terms of Plaintiff's sense of urgency with respect to expectations for those she managed.  (P's Counter-Statement ¶ 55.)  But there is no evidence (and Plaintiff does

not argue) that Ireland relied on that email in making the RBSM decisions, nor does that email, which contains no reference to Plaintiff's age or gender, cast doubt on the credibility of Defendants' explanation.[11]  *See, e.g., Price Waterhouse* 490 U.S. at 277 (O'Connor, J., concurring) (statements "unrelated to the decisional process" do not establish inference of discrimination); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 150 (2d Cir. 2010) (affirming evidentiary ruling and stating that comments "unrelated to the decision-making process" are "at best, only marginally relevant" to discrimination claim);  *Tomassi*, 478 F.3d at 115 ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."); *Spratt v. Verizon Commc'ns Inc.*, No. 11-CV-273, 2014 WL 4704705, at *8 (S.D.N.Y. Sept. 17, 2014) (plaintiff failed to show discriminatory intent where "temporal isolation" of "troubling" remarks by supervisor was "further compounded by the absence of evidence in the record showing any apparent relationship between the remarks and the decisionmaking process that led to Plaintiffs' [*sic*] termination.").[12] In short, Defendants have pointed to an absence of evidence showing that Tyzik influenced the termination decision and have offered affirmative evidence that she did not.  Plaintiff has not, in

---

[11] Plaintiff has offered an alternative argument under the "cat's paw" theory of discrimination, (*see* P's Mem. 22 n.14), which imputes discriminatory motive to a "final decisionmaker that relies entirely on an improperly motivated recommendation from a subordinate," *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011).  That theory is not settled law in this circuit, *see Kregler v. City of N.Y.*, 987 F. Supp. 2d 357, 365-66 (S.D.N.Y. 2013), but in any event I find it inapplicable here.  As set forth above, there is no evidence that Tyzik was involved in or influenced the RBSM decision-making process, let alone evidence that "Mr. Ireland was duped in an intentionally discriminatory fashion by Defendant Tyzik," as Plaintiff argues, (P's Mem. 22 n.14), or that Ireland "relie[d] *entirely*" on Tyzik's recommendation, as the doctrine would require, *Nagle*, 663 F.3d at 117 (emphasis supplied); *see Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003) ("The rule provides that an employer cannot shield itself from liability for unlawful termination . . . where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.").

[12] Even if this email were less remote from the decision-making process, it is the only arguable influence the alleged discriminator had on that process, and thus amounts to an insufficient "scintilla of evidence in support of the plaintiff's position."  *Anderson*, 477 U.S. at 252.

response, pointed to evidence sufficient to create a fact issue on the point.  *See Anderson*, 477 U.S. at 252; *Holcomb*, 521 F.3d at 137.

The majority of Plaintiff's remaining argument focuses on the lack of objective criteria used by Ireland in the decision-making process.  She argues the decision meeting was "a sham process designed to disguise discriminatory intent" because "[n]o reasonable person will find plausible Mr. Ireland's testimony that he used so little information to make such important personnel actions," and "the only facts that Mr. Ireland had were that Plaintiff is female and much younger than the other candidates," concluding that Ireland's explanation for the RBSM decision is "simply preposterous."  (P's Mem. 16, 21, 22.)  Plaintiff also argues that she was more qualified for an RBSM position than the two men chosen, based on objective factors.

The Second Circuit has noted that "there is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview . . . [but] an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir. 2001) (internal quotation marks and alteration omitted).  An "employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext."  *Id.* at 105 (internal quotation marks omitted).  "Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn."  *Id.* (internal quotation marks omitted).

Although Plaintiff has adduced evidence that she at times outperformed her male counterparts (and indeed at times all her counterparts) on certain financial indicators, (Zdanis Decl. Exs. 22-23, 25-27), she has not demonstrated pretext because Defendant's explanation

17

does not concern her sales acumen.  Ireland testified that Plaintiff was well-qualified in the realm

of retail banking, but, given the restructuring, he valued coaching and leadership skills in

prospective RBSMs.  "[L]eadership style is not the sort of wholly subjective and unarticulated

standard" that would support a showing of pretext.  *Tucker v. New York City*, 376 F. App'x 100,

102 (2d Cir. 2010) (summary order) (internal quotation marks omitted); *see id.* (plaintiff's

superior qualifications "[did] not support a finding of pretext because the [defendant] did not

assert that it hired a better qualified applicant, but rather that it hired a more collaborative one").

Plaintiff has offered no evidence of her leadership skills, or that Ireland's concerns were

misplaced.  *See id.* at 103.  While she argues that Ireland had no basis on which to judge her

leadership skills, she admits that she attended a meeting with Ireland in January 2011, (P's

Response to 56.1 ¶ 47), and testified at her deposition (though she now denies) that she and her

competitors made presentations on that subject at the meeting.  (P's Dep. 198:17-18.)  Plaintiff

cannot create a dispute of fact on this issue by denying it in her sworn declaration.  *See*

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may

not create an issue of fact by submitting an affidavit in opposition to a summary judgment

motion that contradicts the affiant's previous deposition testimony.") (alteration and internal

quotation marks omitted).[13]  Ireland's observation of Plaintiff at that meeting and other

---

[13] As Defendant points out, this is but one troubling example of Plaintiff attempting to avoid the import of her deposition testimony through a contradictory declaration.  (*See* Defendant's Amended Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, (Doc. 84), at 2-6.)

       Plaintiff's brief also contains disturbing instances of propositions that were utterly unsupported by the material misleadingly cited in support.  For example, Plaintiff in her brief states that Christopher Gomez, one of the allegedly favored young male employees whom Plaintiff calls the "Young Turks," acknowledged that Plaintiff's performance was far superior to the Young Turks'.  (P's Mem. at 3.)  The brief cites as support for this proposition paragraph 3 of Plaintiff's declaration.  (*Id.*)  Paragraph 3 of Plaintiff's declaration, in turn, states that "[f]or the near six months preceding my termination in June 2011 I was ranked a top-performer, and I had not only out-performed the 2 young male counterparts in my district, I was at the top of the ranking for all 15 Market Managers in the larger Upstate New York Region."  (P's Decl. ¶ 3.)  It cites as support paragraphs 3 and 4 of the Declaration of Christopher Gomez, dated March 11, 2014, which it says is attached as Exhibit 1 to Plaintiff's counsel's declaration.  (*Id.*)  Plaintiff's counsel's declaration as filed contains an HSBC organizational chart as Exhibit 1, and a Declaration of

interactions with her via e-mail  or otherwise provide a plausible basis to judge her coaching and leadership style.[14]  Those abilities are difficult to quantify, yet "[a]n employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position."  *Byrnie*, 243 F.3d at 106.

Plaintiff may disagree that intangibles such as leadership ability should drive the decision of whom to select among several strong performers, but "to defeat summary judgment on the ground of pretext [a plaintiff has] to adduce evidence that his qualifications were 'so superior' to [the chosen candidates'] that 'no reasonable person, in the exercise of impartial judgment, could have chosen [those candidates] over the plaintiff for the job in question.'"  *Turner v. NYU Hosp. Center*, 470 F. App'x 20, 24 (2d Cir. 2012) (summary order) (quoting *Byrnie*, 243 F.3d at 103). The court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments."  *Byrnie*, 243 F.3d at 103 (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)).  "Only where an employer's business decision is so implausible as

---

Mr. Gomez, dated September 12, 2013, as Exhibit 3.  (Zdanis Decl. Ex. 3.)  The September 12, 2013, version of Gomez's declaration contains no information whatsoever about Plaintiff, her performance or her ranking.  (*See id.*) The Court has not been provided with a declaration by Mr. Gomez dated March 11, 2014.

Likewise, Plaintiff states in her brief that she was being targeted for termination by Ireland and Tyzik, who "stated in an email that Plaintiff was 'not winning' on the topic of 'longevity.'"  (P's Mem. at 7.)  The brief cites as support for this proposition paragraph 89 of Plaintiff's declaration.  (*Id.*)  Paragraph 89 of Plaintiff's declaration, in turn, contains no information.  (Presumably in response to my several orders that declarations contain only factual, not argumentative, material, (*see* Docs. 69, 74, 80), Plaintiff redacted material from her declaration, but had paragraph 89 referred to an email, it would have been factual material not required to be redacted.)  The Court has located the email at counsel's declaration Exhibit 16.  "[E]ven a pro se litigant cannot simply dump a stack of exhibits on the court and expect the court to sift through them to determine if some nugget is buried somewhere in that mountain of papers . . . ."  *Carmel v. CSH & C*, No. 14-CV-6385, 2014 WL 3611326, at *2 (W.D.N.Y. July 23, 2014).  The Court surely should not have to do so when a plaintiff is represented.  In any event, the email correspondence is between Tyzik and Joe Geis, another HSBC employee, *not* including Ireland, in which Geis says, without context, "Longevity of staff. To me, that speaks volume of the leader," and Tyzik responds "Ps longevity = fontecchio and she's not winning either."  (Zdanis Decl. Ex. 16.)  How that inscrutable exchange could reflect intent to discriminate based on age or gender, on either Tyzik's or Ireland's part, remains a mystery.

It is difficult for the Court to have confidence in the representations of a party that purports to support its statements by citations that, upon examination, turn out not to support those propositions.

[14] While Ireland never had a one-on-one meeting with Plaintiff, he had observed her in a group setting and accompanied Tyzik on branch visits on one or two occasions.  (P's Counter-Statement ¶ 52.)

to call into question its genuineness should this Court conclude that a reasonable trier of fact

could find that it is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir.

2010) (summary order).  Ireland's decision here does not meet that standard.  He asked Plaintiff

and others to explain how they would inspire middling supervisees to better sales, and his view

that Plaintiff's answer was weak and that she would be less effective as a coach of her

supervisees, cannot be said to be so improbable – particularly given the new emphasis of the

RBSM position – as to suggest that employment of that metric was a cover-up for age or gender

discrimination.[15]

---

[15] To be sure, "qualifications evidence may suffice, at least in some circumstances, to show pretext."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  But Plaintiff's burden at the pretext stage is weightier than the one she bears at the *prima facie* stage: "When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination."  *Byrnie*, 243 F.3d at 103.  As noted, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Id.* (internal quotation marks omitted).

Plaintiff offers the following evidence of her superior qualifications: an e-mail from Ireland (forwarded by Tyzik on March 7, 2011) stating that Plaintiff and Chris Gomez had achieved the highest percentage among market managers of year-to-date Investments and Insurance ("I & I") Revenue Production relative to their end-of-year goals as of February 19, 2011, (Zdanis Decl. Ex. 22); an email from Ireland dated March 15, 2011 stating that as of March 5, 2011, Plaintiff led all market managers in percentage of year-end I & I Revenue Production (*Id.* Ex. 23); an email from Tyzik dated April 4, 2011, stating that Plaintiff had "3 green" while Hoxha had "2 yellow" and Gomez had "1 yellow" (which I take from Plaintiff's brief to mean that Plaintiff had three retail branches achieving "KPI goals" whereas her counterparts did not, *see* P's Mem. 7) (Zdanis Decl. Ex. 25); an email from Ireland forwarded by Tyzik on April 8, 2011, stating that Plaintiff led all market managers in I & I Revenue Production as of April 2, 2011, and was the only market manager with "3/6 KPIs," (*Id.* Ex. 26); and an email from Ireland dated May 19, 2011, stating Plaintiff led all market managers in I & I Revenue Production as of May 16, 2011 (*Id.* Ex. 27).

While this is clearly evidence that Plaintiff was performing her job well – which Defendants do not dispute – the difference between Plaintiff's performance and Hoxha's and Gomez's is not so great that a jury could conclude that no reasonable person could select them over Plaintiff for the RBSM job.  (Plaintiff has not explained why she was more qualified than Lepper, who performed a different job before being selected as an RBSM.  *See* P's Mem. 8.)  For example, as of February 19, Plaintiff tied with Gomez in percentage of I&I target revenue achieved, and Gomez had produced greater total I&I revenue ($313,282) than Plaintiff ($291,946).  (Zdanis Decl. Ex. 22).  As of March 5, 2011, Plaintiff led all market managers in percentage of Investment revenue (112%), but Gomez and Hoxha's percentages were both over 100% (102% and 105%, respectively).  (*Id.* Ex. 23.)  And while Plaintiff had achieved 121% of her mortgage revenue goal on that date, Gomez had achieved 120% and Hoxha 119%.  (*Id.*)  While Plaintiff has produced evidence that she outperformed Gomez and Hoxha on financial indicators, and that she had greater experience, there is no evidence that Gomez and Hoxha were unqualified, and "the court must respect the employer's unfettered discretion to choose among qualified candidates."  *Byrnie*, 243 F.3d at 103 (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

Even if the disparity in qualifications based on these financial measurements were larger, it is of marginal relevance because Defendants have not questioned Plaintiff's qualifications for the RBSM role.  Apart from an

Further undermining any inference that discrimination played a role in Plaintiff's non-selection for the RBSM position is that: a) the alleged discriminator, Tyzik is a woman ten years older than Plaintiff, *see, e.g., White v. Pacifica Found.*, 973 F. Supp. 2d 363, 380 (S.D.N.Y. 2013) (decision-maker in same protected class as plaintiff "undermines any possible inference of discriminatory animus"); fairly evaluated Plaintiff during her employment, (*see* P's Dep. 121:16-122:6, 144:3-145:6; 146:15-148:14, 149:23-150:3); and called Plaintiff two or three days after P's meeting with Ireland to tell P about a job opening with the same pay (P's Response to 56.1 ¶ 72); and b) the decision-maker, Ireland, at the time he decided not to give one of the RBSM positions to P, gave half of the six openings to women over forty, (*Id.* ¶ 64; Hutter Decl. ¶ 22) and gave one of two district director positions to Tyzik, a woman well over forty, (P's Response to 56.1 ¶ 54).

Because she has failed to demonstrate that Defendants' proffered reason for her termination is a pretext for discrimination, summary judgment in favor of Defendants is warranted on Plaintiff's Title VII, ADEA, and NYSHRL disparate treatment claims.[16]

## C. Hostile Work Environment Claims

---

apparent preference that statistical performance be the only criterion, Plaintiff has not explained why the above-cited figures render Defendants' asserted justification – regarding her coaching and leadership style – false. *See Reeves*, 530 U.S. at 148. The strength of the numbers is not by itself (or in light of the record as a whole) enough to do so.

[16] Plaintiff's NYSHLR claims against Tyzik in her individual capacity should also be dismissed. Plaintiff seeks to hold Tyzik liable as an "aider and abettor" under N.Y. Exec. Law § 296(6), which the Second Circuit has interpreted to apply to "a defendant who actually participates in the conduct giving rise to a discrimination claim," whether or not they had hiring or firing authority. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Courts in this circuit, however, have expressed reluctance to extend this provision to cases in which "the only individual defendant against whom the claim can be brought is the alleged primary harasser," which would result in the individual defendant "aid[ing] and abet[ing] himself." *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 115 (E.D.N.Y. 2011) (emphasis omitted). *But see Maher v. Alliance Mortgage Banking Corp.*, 650 F. Supp. 2d 249, 262 (E.D.N.Y. 2009) ("[A]n individual may be liable under § 296(6) for aiding and abetting an unlawful discriminatory practice of his employer even where his conduct serves as the sole predicate for the employer's liability."). Even if the claim could proceed under the aiding and abetting provision, there can be no individual liability where the employer is found not liable. *Alexander*, 829 F. Supp. 2d at 115-16 (citing *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010)).

Plaintiff has voluntarily withdrawn her hostile work environment claims.  (P's Mem. 25.)

### D.  Retaliation Claims

I dismissed Plaintiff's Title VII and ADEA retaliation claims for failure to exhaust administrative remedies, (*see* Doc. 31), but Plaintiff's retaliation claim under New York Human Rights Law, *see* N.Y. Exec. Law § 296(7), remains.  "[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII," *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006), and are analyzed under the same burden-shifting framework, *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012).  "To establish a prima facie case of retaliation under the NYSHRL, as under federal employment anti-discrimination law, a plaintiff-employee must show that (1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action."  *Id.* at 361-62.

Plaintiff has not shown that she engaged in protected activity.  She claims that she stood up to protect other older female colleagues, (P's Mem. 25), but there is no evidence that she did so with reference to age or gender.  It is undisputed that Plaintiff told Tyzik she "did not agree with putting Ms. Slettene on 'probation,'" (P's Response to 56.1 ¶ 95), but Plaintiff testified at her deposition that she did not complain about discrimination targeted at her or anyone else:

> Q: You never complained that others were being discriminated against while you were working at HSBC?
> . . .
> A: That's correct.
> Q: You never complained that others were being harassed while you worked at HSBC, correct?
> . . .
> A: That is correct.

P's Dep. 109:19-110:4.  Plaintiff points to further testimony from the same deposition she claims proves otherwise:

> Q: Well, you never told [Tyzik] that you felt that she was discriminating against anybody, correct?
> . . .
> A: I never used the word discriminating against.  I talked to her about objecting to other employees and trying to work with her on other employees, but that was very – it was always – I was always very uncomfortable in doing that with her.

*Id.* at 271:15-24.  But even if Plaintiff objected to certain work-related decisions regarding female employees, there is no evidence that she complained of discrimination, *i.e.*, that the objectionable decisions were motivated by gender.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."); *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 522 (S.D.N.Y. 2010) (dismissing retaliation claim where "[plaintiff] failed to couch his complaint in terms of gender discrimination, [and thus] there was nothing in [plaintiff's] protests that could reasonably have led [defendant] to understand that gender was the nature of his objections.") (internal quotation marks and alterations omitted).

The only evidence of arguably protected activity Plaintiff offers is in her declaration, which states, "[O]n several occasions Tyzik noticeably changed her demeanor when I tried to defend other female employees with respect to the favorable treatment Tyzik gave [males]."  (P's Decl. ¶ 130.)  But Plaintiff previously testified that she never complained about discrimination directed at other employees, and she cannot create a factual dispute by offering a contradictory declaration.  *See Bickerstaff*, 196 F.3d at 455.  And even her declaration does not suggest she raised age or gender on any of the occasions when she defended a female employee.  (P's Decl. ¶¶ 128-131).

Even if Plaintiff had established that she engaged in protected activity, and that Defendants knew about it, her retaliation claim would fail on the fourth element. There is a lack of evidence of any causal connection between her objections and her termination. Plaintiff asserts no temporal proximity between any protected activity and the adverse action.[17] She admits that she never complained to Ireland about Tyzik's actions, (P's Response to 56.1 ¶ 105), and, for the reasons stated above, there is no evidence that Tyzik influenced Ireland's decision to terminate Plaintiff. Accordingly, summary judgment in favor of Defendants is warranted on Plaintiff's retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED and all claims are dismissed. The Clerk of Court is respectfully directed to terminate Defendants' Motion, (Doc. 49), enter judgment for Defendants, and close the case.[18]

**SO ORDERED.**

Dated: January 23, 2015
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[17] Plaintiff's declaration does not provide a date on which she "tried to defend other female employees." (P's Decl. ¶ 130.) The complaint alleged that she did so "throughout 2010 and into 2011," (Doc. 10 ¶ 51), but Plaintiff has produced no evidence to support that allegation. Indeed, she devotes a total of three sentences to defending her retaliation claim in her brief opposing summary judgment. (P's Mem. 25.)

[18] Plaintiff's request for leave to amend the complaint, (*see* Docs. 87, 88), is denied as moot in light of her filing a new case against Defendant. (*See* No. 15-CV-147.)